Elizabeth A. McNamara (*Pro Hac Vice* Application forthcoming)
    lizmcnamara@dwt.com
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 603-6437
Fax: (212) 489-8340

Sean M. Sullivan, Esq. (Cal. Bar No. 229104)
    seansullivan@dwt.com
Arleen Fernandez (Cal. Bar No. 318205)
    arleenfernandez@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Fax: (213) 633-6899

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP; UNIVERSAL CITY STUDIOS LLC; UNIVERSAL TELEVISION LLC; UNIVERSAL CONTENT PRODUCTIONS LLC; DREAMWORKS ANIMATION LLC; DISNEY ENTERPRISES, INC.; PARAMOUNT PICTURES CORPORATION; AMAZON CONTENT SERVICES LLC; APPLE VIDEO PROGRAMMING LLC; WARNER BROS. ENTERTAINMENT INC.; NETFLIX US, LLC; COLUMBIA PICTURES INDUSTRIES, INC.; and, SCREEN GEMS, INC.<br><br>                    Plaintiffs,<br><br>        vs.<br><br>DWAYNE ANTHONY JOHNSON d/b/a ALLACCESSTV and QUALITY RESTREAMS; and DOES 1-20,<br><br>                    Defendants. | **Case No. 2:21-cv-09361-AB (MRWx)**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:        Hon. Andre Birotte Jr.<br>Date:         January 7, 2022<br>Time:         10:00 a.m.<br>Courtroom: 7B<br><br>Filed concurrently herewith:<br>(1) Declaration of Jan Van Voorn<br>(2) Declaration of Steve Kang<br>(3) Declaration of Sean M. Sullivan<br>(4) [Proposed] Preliminary Injunction<br><br>Action Filed:  December 2, 2021<br>Trial Date:  None Set |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 7, 2022, at 10:00 a.m., or as soon thereafter as counsel may be heard,[1] before the Honorable Andre Birotte Jr., in Courtroom 7B of the United States District Court for the Central District of California, located at First Street Courthouse, 350 W. First Street, Los Angeles, California 90012, Plaintiffs Universal City Studios Productions LLLP, Universal City Studios LLC, Universal Television LLC, Universal Content Productions LLC, DreamWorks Animation LLC, Disney Enterprises, Inc., Paramount Pictures Corporation, Amazon Content Services LLC, Apple Video Programming LLC, Warner Bros. Entertainment Inc., Netflix US, LLC, Columbia Pictures Industries, Inc., and Screen Gems, Inc. (collectively, "Plaintiffs"), will, and hereby do, move for a Preliminary Injunction:

1) Enjoining Defendants Dwayne Anthony Johnson ("Johnson") d/b/a AllAccessTV ("AATV") and Quality Restreams, and the individuals or entities, who, along with Dwayne Anthony Johnson, own or operate the infringing services of AATV and Quality Restreams (collectively with Johnson, "Defendants"), and all individuals acting in concert or participation or privity with them, including Defendants' resellers, from publicly performing, reproducing, distributing, or otherwise infringing in any manner (including, without limitation, by materially contributing to or intentionally inducing the infringement of) Plaintiffs' rights under the Copyright Act in the works identified in **Exhibit A** to the Complaint in this action ("Copyrighted Works"), as well any other works Plaintiffs own or control and that Defendants illegally exploit.

---

[1] Plaintiffs have commenced this action and served this Motion to seek preliminary injunctive relief pending adjudication of their claims.  However, without waiver or prejudice as to their assertion that the requested preliminary relief is necessary to prevent irreparable harm to their rights, Plaintiffs defer to the Court as to the proper timing for this Motion in light of the exigent circumstances and limitations on judicial resources created by the current COVID-19 public health emergency.

2)      Enjoining the respective domain name registrars for Defendants' Websites[2] from allowing these domains to be modified, sold, transferred to another owner, or deleted, and also requiring them to disable access to the Websites.

This Motion is made on the following grounds as explained in the accompanying Memorandum of Points and Authorities and supporting papers:

- Plaintiffs are likely to succeed on the merits because the evidence clearly shows that Defendants, without authorization from Plaintiffs, transmit performances of the Copyrighted Works to members of the public on a mass scale, in violation of Plaintiffs' exclusive rights to publicly perform the Copyrighted Works, 17 U.S.C. § 106(4), and also infringe upon Plaintiffs' exclusive reproduction rights through the unauthorized copying of the Copyrighted Works for Defendants' 24/7 channels and VOD offerings, *id*. § 106(1).  The evidence also shows that Defendants are secondarily liable for the infringement of Plaintiffs' exclusive public performance and reproduction rights in the unauthorized copying of the Plaintiffs' Copyrighted Works, including by creating and growing a network of resellers who promote and sell Defendants' infringing services;

- Absent a preliminary injunction, Plaintiffs will suffer irreparable harm, including with respect to their ability to exercise their exclusive rights and their relationships and goodwill with authorized licensees;

- The balance of the equities tips decidedly in Plaintiffs' favor; and,

- An injunction is in the public interest.

This Motion is based upon this Notice of Motion and Motion; the attached Memorandum of Points and Authorities; the Declarations of Jan Van Voorn ("Voorn

---

[2] Defendants own and/or control several Internet domains (collectively, "Websites") used in their infringing enterprises, including: aatvdigitalmedia.com, aatvpanel.com, aatvapp.live, myaatv.com, aatvdigital.com, aatvwebplayer.com, allaccessiptv.com, allaccesstv.live, tv.allaccesstv.live, vod.allaccesstv.live, kids.allaccesstv.live, aatv.media, qualityrestreams.com, qsplaylist.com, qualitystreamz.guru, qsprovider.com, mediaflo.net, vpnsafevault.com, backoffice.vpnsafevault.com, and v2.dmdapi.com. Declaration of Jan Van Voorn ¶ 12.

Decl."), Steve Kang ("Kang Decl."), and Sean M. Sullivan ("Sullivan Decl.") and Exhibits thereto; all documents on file in this action, including the Complaint; and such further or additional evidence or argument as may be presented before or at the time of the hearing on this Motion.

DATED: December 8, 2021                              _____/s/ Sean M. Sullivan_____
                                                     Sean M. Sullivan
                                                     Arleen Fernandez
                                                     DAVIS WRIGHT TREMAINE LLP
                                                     865 South Figueroa Street, 24th Floor
                                                     Los Angeles, California 90017-2566

                                                     Elizabeth A. McNamara
                                                     DAVIS WRIGHT TREMAINE LLP
                                                     1251 Avenue of the Americas, 21st Floor
                                                     New York, NY 10020

                                                     Attorneys for Plaintiffs

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

I.     INTRODUCTION .................................................................................... 1

II.    FACTUAL BACKGROUND ................................................................... 2

    A.   Plaintiffs and Their Copyrighted Works ..................................... 2

    B.   Defendants' Infringing Services .................................................. 3

        1.   Defendants' Illegal AATV Service ................................... 4

        2.   Defendants' Illegal Quality Restreams Service ................ 7

        3.   Defendant Johnson Is Behind Both Infringing Enterprises ........................................................................ 8

    C.   Defendants Use a Growing Network of Resellers to Increase Subscribers and Profits ............................................... 9

    D.   Defendants Know Their Illegitimate Services Are Unlawful ................................................................................... 10

III.   ARGUMENT ....................................................................................... 11

    A.   Plaintiffs Are Likely to Succeed on the Merits ......................... 11

        1.   Plaintiffs Own or Control Valid Copyrights in The Works Defendants Exploit ............................................. 12

        2.   Defendants Directly Infringe Plaintiffs' Exclusive Rights .............................................................................. 12

            (a)   Defendants Publicly Perform Plaintiffs' Copyrighted Works ................................................ 12

            (b)   Defendants Reproduce Plaintiffs' Copyrighted Works ................................................ 14

        3.   Defendants Are Liable for Secondary Infringement ....... 15

            (a)   Defendants Are Liable for Contributory Infringement ......................................................... 15

                (1)   Defendants Possesses Knowledge of Infringement ................................................ 15

                (2)   Defendants Materially Contribute to Infringement ................................................ 17

            (b)   Defendants Are Liable for Inducing Infringement . 17

                (1)   Defendants Distribute Infringing Services ... 18

                (2)   Defendants' Object of Promotion Is Infringement ................................................ 18

                (3)   Defendants' Actions Cause Infringement .... 19

    B.   Plaintiffs Will Suffer Irreparable Harm if an Injunction Does Not Issue .......................................................................... 19

    C.   The Balance of Hardships Tips Sharply in Plaintiffs' Favor ..... 22

i

        D.      An Injunction Serves the Public Interest ................................... 23

IV.     RELIEF REQUESTED ......................................................................... 24

        A.      Plaintiffs Request an Injunction That Protects Their
                Copyrights ................................................................................... 24

        B.      No Bond Should Be Required ...................................................... 25

V.      CONCLUSION ................................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                **Page**

*A&M Recs., Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001),
   *as amended* (Apr. 3, 2001) ..................................... 11, 12, 14, 15, 16, 17

*Am. Broad. Cos., Inc. v. Aereo, Inc.*,
   573 U.S. 431 (2014) ........................................................................ 13

*Amazon Content Servs., LLC v. Set Broad., LLC*,
   No. 2:18-cv-03325-MWF-ASx, ECF No. 59
   (C.D. Cal. July 31, 2019) ................................................................... 2

*Apple Inc. v. Psystar Corp.*,
   673 F. Supp. 2d 943 (N.D. Cal. 2009),
   *aff'd*, 658 F.3d 1150 (9th Cir. 2011) ................................................ 23

*Arista Recs. LLC v. Lime Grp. LLC*,
   2011 WL 1641978 (S.D.N.Y. Apr. 29, 2011) ................................... 13

*Arista Recs. LLC v. Usenet.com, Inc.*,
   633 F. Supp. 2d 124 (S.D.N.Y. 2009) ............................................. 13

*Cadence Design Sys., Inc. v. Avant! Corp.*,
   125 F.3d 824 (9th Cir. 1997) ........................................................... 23

*China Cent. Television v. Create New Tech. (HK) Ltd.*,
   2015 WL 3649187 (C.D. Cal. June 11, 2015) .................................. 19

*Columbia Pictures Indus., Inc. v. Fung*,
   710 F.3d 1020 (9th Cir. 2013) .................................................... 18, 19

*Columbia Pictures Indus., Inc. v. Galindo*,
   2020 WL 3124347 (C.D. Cal. May 11, 2020) ......... 2, 13, 14, 20, 21, 23, 24, 25

*Diaz v. Brewer*,
   656 F.3d 1008 (9th Cir. 2011) ......................................................... 25

*Disney Enters., Inc. v. VidAngel, Inc.*,
   No. 2:16-cv-04109-AB-PLAx, ECF Nos. 144, 520
   (C.D. Cal. Sept. 5, 2019) ................................................................... 2

*Disney Enters., Inc. v. VidAngel, Inc.*,
371 F. Supp. 3d 708 (C.D. Cal. 2019) ..................................................... 14

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ......................................................... 11, 23

*Disney Enters., Inc. v. VidAngel, Inc.*
224 F. Supp. 3d 957 (C.D. Cal. 2016),
*aff'd*, 869 F.3d 848 (9th Cir. 2017) ......................... 12, 13, 15, 20, 21

*Eldred v. Ashcroft*,
537 U.S. 186 (2003) .............................................................................. 23

*Elsevier Inc. v. Siew Yee Chew*,
2019 WL 74606 (S.D.N.Y. Jan. 2, 2019) ........................................... 16

*Erickson Prods., Inc. v. Kast*,
921 F.3d 822 (9th Cir. 2019) ............................................................... 15

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
76 F.3d 259 (9th Cir. 1996) ................................................................. 17

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
915 F. Supp. 2d 1138 (C.D. Cal. 2012) ............................. 13, 20, 21, 22

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009) ............................................................. 25

*Kelly v. Primco Mgmt., Inc.*,
2015 WL 10990368 (C.D. Cal. Jan. 12, 2015) ................................... 23

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
658 F.3d 936 (9th Cir. 2011) ............................................................... 16

*MAI Sys. Corp. v. Peak Computer, Inc.*,
991 F.2d 511 (9th Cir. 1993) ............................................................... 14

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
518 F. Supp. 2d 1197 (C.D. Cal. 2007) ............................................... 22

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) .............................................................................. 18

*Nat'l Football League v. PrimeTime 24 Joint Venture*,
211 F.3d 10 (2d Cir. 2000) ................................................................... 13

*Paramount Pictures Corp. v. Omniverse One World Television, Inc.*,
   No. 2:19-cv-01156-MWF-ASx, ECF No. 60
   (C.D. Cal. Nov. 14, 2019) .................................................................................. 2

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) .................................................................. 11, 17

*Showtime Networks Inc. v. Doe*,
   2015 WL 12646501 (C.D. Cal. Apr. 30, 2015) ...................................... 24

*Solid Host, NL v. Namecheap, Inc.*,
   652 F. Supp. 2d 1092 (C.D. Cal. 2009) ................................................ 16

*Tiffany Design, Inc. v. Reno-Tahoe Specialty, Inc.*,
   55 F. Supp. 2d 1113 (D. Nev. 1999) ..................................................... 15

*Triad Sys. Corp. v. Se. Express Co.*,
   64 F.3d 1330 (9th Cir. 1995),
   *superseded by statute on other grounds*, 17 U.S.C. § 117(c) ............... 23

*Unicolors, Inc. v. Urban Outfitters, Inc.*,
   853 F.3d 980 (9th Cir. 2017) .................................................................. 17

*United Fabrics Int'l, Inc. v. C&J Wear, Inc.*,
   630 F.3d 1255 (9th Cir. 2011) ............................................................... 12

*Universal City Studios Prods. LLLP v. TickBox TV LLC*,
   No. 2:17-cv-07496-MWF-ASx, ECF Nos. 44, 72
   (C.D. Cal. Sept. 12, 2018) ....................................................................... 2

*Universal City Studios Prods. LLLP v. TickBox TV LLC*,
   2018 WL 1568698 (C.D. Cal. Jan. 30, 2018) .......................... 13, 15, 18, 19, 22

*VHT, Inc. v. Zillow Grp., Inc.*,
   918 F.3d 723 (9th Cir. 2019) .................................................................. 15

*Warner Bros. Ent. Inc. v. WTV Sys., Inc.*,
   824 F. Supp. 2d 1003 (C.D. Cal. 2011) .......................... 13, 19, 20, 21

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................. 11, 22

*WPIX, Inc. v. ivi, Inc.*,
   691 F. 3d 275 (2d Cir. 2012) ................................................................. 19

**Statutes**

17 U.S.C.

§ 101(2) ................................................................................................. 13
§ 106(1) .............................................................................................. 1, 14
§ 106(4) .............................................................................................. 1, 12
§ 117(c) ................................................................................................. 23
§ 410(c) ................................................................................................. 12
§ 502(a) ................................................................................................. 11
§ 504(c) ................................................................................................. 22

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendants own or operate the illicit enterprises AllAccessTV ("AATV") and Quality Restreams—both unauthorized online streaming services engaged in mass-scale infringement of Plaintiffs' Copyrighted Works.  AATV is an infringing Internet Protocol television ("IPTV") and video-on-demand ("VOD") service that sells—through an expanding network of resellers—unauthorized access to copyrighted movies and television programs via its 2,500 live and title-curated television channels and over 1,200 VOD offerings.  Quality Restreams provides copyrighted content to numerous prominent illicit IPTV services, including AATV.  The television channels and VOD features offered by Defendants through these infringing enterprises exploit the rights—without authorization—to many of Plaintiffs' most popular movies and television programs, such as *The Godfather*, *Harry Potter*, *Jurassic Park*, and *The Office*, among countless others.  As a result, Plaintiffs now move for a preliminary injunction enjoining further infringement of their Copyrighted Works and, among other things, prohibiting the transfer of the domain names being used to propagate Defendants' infringing services.  This Court should grant Plaintiffs' Motion for the following reasons.

*First*, Plaintiffs are likely to succeed on the merits because, as set forth in further detail below, Defendants' unauthorized streaming services infringe upon Plaintiffs' exclusive rights to reproduce and publicly perform their Copyrighted Works under 17 U.S.C. §§ 106(1), 106(4).  To the extent Defendants claim they are only facilitating access to infringing streams provided by third-parties, Defendants are still liable for contributory copyright infringement.  *Second*, Defendants' unauthorized streaming inflicts irreparable harm on Plaintiffs' businesses by undermining their relationships with licensees and legitimate channels that are part of a broad content-delivery ecosystem. *Third*, the balance of hardships tips heavily in Plaintiffs' favor since the ongoing and threatened harms suffered by Plaintiffs are

1

irreparable, and outweighs the harm, if any, that may result from enjoining Defendants' illicit enterprises. ***Finally***, an injunction here is necessary to protect Plaintiffs' copyright interests against illicit commercial exploitation and, as a result, the requested injunction is in the public interest.[3]

The case for an immediate injunction here is overwhelming. Plaintiffs have already suffered great harm and that harm will only worsen if Defendants' operations continue unchecked. For all these reasons, Plaintiffs respectfully request the Court enter the concurrently filed proposed injunction.

## II.   FACTUAL BACKGROUND

### A.   Plaintiffs and Their Copyrighted Works

Plaintiffs and/or their affiliates produce and distribute many of the world's most coveted, lauded, and award-winning motion pictures and television programs. Declaration of Steve Kang ("Kang Decl.") ¶ 4. Plaintiffs and/or their affiliates also own or control the exclusive U.S. rights to, among other things, reproduce, distribute, and publicly perform the Copyrighted Works, including by means of streaming those works over the Internet to the public. *Id*. ¶¶ 4, 6. Plaintiffs and/or their affiliates have invested and continue to invest substantial resources and effort to develop, produce, and distribute their Copyrighted Works. *Id*. ¶ 7. As a result, protection of these works is critical to Plaintiffs' ability to earn a return on their

---

[3] Defendants are the latest in a long line of illegal online streaming services that steal Plaintiffs' content to reap ill-gotten profits. Plaintiffs have been forced to pursue multiple actions against such services, successfully obtaining injunctive relief to stop this brazenly illegal activity. *See, e.g., Columbia Pictures Indus., Inc. v. Galindo*, No. 2:20-cv-03129-SVW-GJS, 2020 WL 3124347 (C.D. Cal. May 11, 2020) (preliminary injunction); *Paramount Pictures Corp. v. Omniverse One World Television, Inc*., No. 2:19-cv-01156-MWF-ASx, ECF No. 60 (C.D. Cal. Nov. 14, 2019) (permanent injunction); *Amazon Content Servs., LLC v. Set Broad., LLC*, No. 2:18-cv-03325-MWF-ASx, ECF No. 59 (C.D. Cal. July 31, 2019) (permanent injunction); *Disney Enters., Inc. v. VidAngel, Inc*., No. 2:16-cv-04109-AB-PLAx, ECF Nos. 144, 520 (C.D. Cal. Sept. 5, 2019) (preliminary and permanent injunction); *Universal City Studios Prods. LLLP v. TickBox TV LLC*, No. 2:17-cv-07496-MWF-ASx, ECF Nos. 44, 72 (C.D. Cal. Sept. 12, 2018) (preliminary and permanent injunction).

investments and to invest in new projects.  *Id*.

Plaintiffs, either directly or indirectly through their affiliates, authorize the legitimate distribution, reproduction, and public performance of the Copyrighted Works in various formats and through multiple distribution channels.  These distribution channels include, among others: (1) authorized, licensed cable and direct-to-home satellite services (including basic, premium, and "pay-per-view"); (2) broadcast television networks and linear video programming services; (3) authorized, licensed Internet VOD services, including those operated by Amazon Prime Video, iTunes, Apple TV+, Netflix, Google Play, Disney+, Peacock, and Vudu; and, (4) authorized, licensed Internet or over-the-top ("OTT") streaming services, including those offered by Hulu+ Live TV, DirecTV Stream, fubo TV, Sling TV, and YouTube TV.  *Id*. ¶ 8.

Plaintiffs have not licensed Defendants to exercise any of their rights to the Copyrighted Works.  *Id*. ¶ 5.

### B.    Defendants' Infringing Services

Defendants own and operate two related illicit enterprises.  The first, AATV, is an infringing IPTV and VOD service that provides subscribers unauthorized access to copyrighted movies and television programs, including Plaintiffs' Copyrighted Works.  Declaration of Jan Van Voorn ("Voorn Decl.") ¶¶ 6-7, 13. Defendants' subscribers access infringing content through web-based applications for platforms such as smart TVs, computers, set-top boxes, and mobile and tablet devices, depending on whether the subscriber uses iOS or Android devices (collectively, the "AATV Platforms").  *Id*. ¶ 7.

The other, Quality Restreams, is a "content-provider" for various illegal IPTV services, including AATV.  *Id*. ¶¶ 6, 8, 13.  Like its counterpart AATV, Quality Restreams provides these IPTV operators (and their customers) with unauthorized access to copyrighted movies and television programs through thousands of live television channels and VOD offerings.  *Id*. ¶ 8.  These infringing enterprises are

3

described in further detail below.

### 1.      Defendants' Illegal AATV Service

In exchange for subscription fees, Defendants' AATV service offers two infringing options: IPTV and VOD.  Defendants sell their customers subscriptions to the IPTV service through a network of third-party resellers (discussed in further detail in Section II.C, *infra*), who sign customers up for the service on Defendants' AATV Websites.  Voorn Decl. ¶ 21.  Monthly subscription prices for the IPTV service range from $10.00 to $45.00 per month, depending on the number of connections and channel offerings a user selects.  *Id.* ¶¶ 23-24, Ex. 12.[4]

After buying a subscription from Defendants' resellers, the customer creates login credentials via Defendants' AATV Websites and obtains detailed instructions for accessing the service after contacting a 24/7 text support line operated by Defendants' "support staff."  *Id.* ¶ 28.  Following the instructions, subscribers can access the IPTV service through a variety of different AATV Platforms, including by downloading an application on their smart TV, mobile device, or tablet.[5]  *Id.* Once logged into an AATV Platform, a subscriber can choose from a staggering number—over 2,500—of live television channels, a volume that far exceeds what a customer could obtain through a legitimate licensed service (let alone at the same

---

[4] Defendants have used various AATV websites to sell AATV subscriptions. For example, in June 2021, the primary interface was aatvpanel.com.  Voorn Decl. ¶¶ 21-22.  After connecting with a reseller, customers were first directed to navigate to aatvdigitmedia.com, where they were then redirected to aatvpanel.com to sign up for the AATV service and create credentials later used to access the AATV Platforms. *Id.*, Exs. 10-11.  Currently, Defendants direct users to backoffice.vpnsafevault.com to purchase and manage AATV subscriptions. *Id.* ¶¶ 21, 26.
[5] On iOS devices, users use the Supa Legacy IPTV application to access AATV. After downloading the application, users must take a photo of their MAC Address and connect with AATV support to activate their device.  On Android, a user must first visit the following links for live, VOD, and kids' applications: http://tv.allaccesstv.live/, http://vod.allaccesstv.live/, and http://kids.allaccesstv.live. After downloading the applications, the user then enters their password to access the platforms.  The AATV Platforms for Android users use the domain v2.dmdapi.com to authenticate user requests on the backend. Voorn Decl. ¶¶ 28-29, Exs. 16-17.

4

price point).  *Id.* ¶ 31.  The IPTV service essentially works as follows: television programs or motion pictures airing on a particular television channel (*e.g.*, A&E, FX, Comedy Central) are streamed within seconds of the original source of the telecast through the AATV Platforms, which means AATV subscribers can view these television programs or motion pictures virtually simultaneous with the telecast, *i.e.*, "live," but without subscribing to those channels through a legitimate service. Defendants' IPTV services include broadcast networks like ABC, NBC, and Fox, as well as paid cable channels like A&E, MTV, BET, Comedy Central, USA Network, and premium channels such as HBO and Cinemax.  *Id.* ¶¶ 31-32, Ex. 19.  In short, once an AATV subscriber clicks a live-channel offering, Defendants stream the content—often Plaintiffs' Copyrighted Works—playing on that channel to the subscriber, in violation of Plaintiffs' public performance right.  The image below features an episode of *The Office* streaming on the hijacked Comedy Central channel:



         In addition to live television channels, Defendants also offer what they label as "24/7" channels, or title-curated channels devoted to a specific television series, movie, or other content collections, through the AATV Platforms.  *Id.* ¶ 34.  Unlike the live television channels Defendants illegally offer where Defendants hijack an

authorized transmission stream, Defendants' 24/7 channels continuously stream a single movie, all of the movies in a franchise or collection, or all of the episodes in a television series. *Id.* By way of example, the 24/7 channels dedicated to Warner Bros.' *Harry Potter* and Universal's *Jurassic Park*, stream movies from those franchises continuously. *Id.*, Ex. 20. These offerings necessarily involve making copies of works to provide the content that populates the channels. *Id.* ¶ 35; *see* Section III.A.2.b, *infra*.

Along with the live television and 24/7 channels, Defendants also offer movies and television programs for on-demand viewing through their VOD service on the AATV Platforms. Customers purchase subscriptions to Defendants' VOD service through the same AATV Websites they use to subscribe to Defendants' IPTV service. *Id.* ¶ 36. These customers can "add on" packages that include Defendants' VOD service, such as the "Premium Package," which allows users to access VOD and "Premium Movie" content for as little as $15 per month. *Id.* ¶ 24, Ex. 12.

Like Defendants' IPTV service, the quantity of copyrighted content available through the VOD service is massive. Defendants currently offer over 600 movie titles and 600 television series—including Plaintiffs' Copyrighted Works— for immediate on-demand viewing. *Id.* ¶ 37. For example, with the click of a button, AATV subscribers are able to stream some of Plaintiffs' most popular works, such as Paramount's *The Godfather*. *Id.* ¶ 38, Ex. 21.[6] The AATV Platforms also allow customers to choose from numerous categories, including the legitimate streaming services on which the movies and television series appear, such as "Netflix," "Amazon Prime Video," "Hulu," "HBOMax," and "Disney+". Defendants' library includes content exclusively found on these streaming services, as partially depicted below.

---

[6] The Copyrighted Works provided via the VOD service also include Disney's *Toy Story* and Warner Bros.' *Friends*, among many others. *See* Complaint, Ex. A.



When a customer selects a title, the title (along with an image showing a theatrical poster or cover art for the title) appears on the customer's screen. *Id*. ¶ 38.

Defendants' 24/7 and VOD features necessarily mean that copies of the Copyrighted Works have been made and stored on servers, from which streams can be provided on a continuous loop or "on demand." Defendants therefore directly exercise (and infringe) Plaintiffs' exclusives rights of reproduction and public performance. *Id*. ¶¶ 35, 39; *see* Section III.A.2, *infra*.

### 2.    Defendants' Illegal Quality Restreams Service

Defendants also operate the Quality Restreams service, which provides content—including Plaintiffs' Copyrighted Works— to several illegitimate IPTV services, including AATV. Voorn Decl. ¶¶ 40-42.

Quality Restreams accomplishes this by providing IPTV operators with access to certain IP addresses and/or domain-based access through which Defendants stream live channels and VOD offerings.[7] *Id*. ¶¶ 40-41. For instance, CosmosTV, an illicit IPTV service, was sourcing content from a content delivery server located

---

[7] Defendants operate Quality Restreams using several disparate domains, including qualityrestreams.com, qsplaylist.com, qualitystreamz.guru, and qsprovider.com. Voorn Decl. ¶ 41.

at IP address 23.237.94.34, an address affiliated with several websites owned and/or operated by Defendants, including qsplaylist.com, myaatv.com, and allaccessiptv.com.  *Id*. ¶ 41.  AATV also obtains its content—including Plaintiffs' Copyrighted Works—from Quality Restreams.  *Id*. ¶ 42.  Among other things, AATV's content is sourced from mediaflo.net.  Until recently, one of mediaflo.net's subdomains, shou06.mediaflo.net, used an IP address (23.237.162.170) that is very close to the IP address of qsplaylist.com (23.237.94.34).  *Id*.  The AATV Platform for Android users also previously sourced its images from qsplaylist.com.  Further, aatvapp.live, a website affiliated with AATV, has used the IP address 104.243.41.74, which is also associated with qsplaylist.com, qualitystreamz.guru, and qsprovider.com.  *Id*.

### 3. Defendant Johnson Is Behind Both Infringing Enterprises

Defendant Johnson owns and controls the illegal AATV service.  Among other things, Johnson is the registrant for allaccessiptv.com and myaatv.com, two domains associated with the AATV service.  Voorn Decl. ¶ 14, Exs. 1-2.  Johnson is also a registered manager of VPN Safe Vault LLC, a company that bears a virtually identical name to the domain backoffice.vpnsafevault.com, the site through which Defendants currently sell AATV subscriptions.  *Id*. ¶ 19, Ex. 9.  He is also one of the creators and administrators of the private Facebook group titled MediaBoxx Corporation.  *Id*. ¶ 17, Ex. 7.  This group was limited exclusively to AATV resellers and was used by Johnson and others to communicate about their infringing activities.  *Id*.  Johnson has also offered webinars on how to become an AATV reseller.  *Id*. ¶ 16, Ex. 6.  The advertisements for the webinars market AATV as an opportunity for potential resellers to "build a residual income stream" and "get free streaming TV service for life."  *Id*., Ex. 6; *see* Section II.C, *infra*.

Johnson is also behind the infringing Quality Restreams service.  He has advertised the service on the website IPTV.Community under the name DJ_Boxx, which is connected to the Skype ID "dwayne.johnson34," indicating that Johnson

8

owns and/or operates the Quality Restreams service.  *Id*. ¶ 15, Exs. 3-4.  The listed date of birth on DJ_Boxx's profile also matches Johnson's date of birth.  *Id*. Johnson is also the registrant for the website myaatv.com at the IP address 23.237.94.34—the same IP address for qsplaylist.com.  This IP address is within the same IP address range leased to The MediaBoxx, an entity owned and operated by Johnson.[8]  *Id*. ¶ 20.  Further, two of the three domains associated with Quality Restreams (qualityrestreams.com and qsprovider.com) have also been associated with IPs within the range of those leased to The MediaBoxx.  *Id*.

        **C.**      **Defendants Use a Growing Network of Resellers to Increase Subscribers and Profits**

Defendants have expanded the scope of their unlawful commercial enterprises by creating and growing a network of resellers who market and promote their services to attract new subscribers.  Voorn Decl. ¶ 44.  In particular, Defendants operate the AATV reseller program as a multilevel marketing scheme.  The program works like this: Defendants recruit individuals, namely AATV customers, to sell subscriptions on their behalf, advertising the program as a streaming "franchising opportunity."  *Id*. ¶¶ 45-46.  Resellers earn money based on their recruits' sales as well as their own.  *Id*. ¶ 45.  For example, in 2020, if a recruit sold a $25 per month subscription, the reseller that recruited him or her earned a $10 commission on that sale.  *Id*., Ex. 22.  As a result, resellers are encouraged to recruit as many individuals as possible in order to maximize their commissions.  *Id*. ¶ 45.  Resellers also obtain discounts on their own AATV subscriptions in exchange for customer referrals.  *Id*. ¶ 46.

Defendants' reseller program plays a pivotal role in their infringing enterprises. To start, the reseller program dramatically increases Defendants' customer base and

---

[8] MediaBoxx Corporation is also the name of the AATV reseller Facebook group created and administered by Johnson.  The AATV reseller Facebook group once had more than 780 members.  Voorn Decl. ¶ 47, Ex. 7.

profits—more resellers means more customers buying illegal access to the Copyrighted Works and other copyrighted content, and more money flowing into Defendants' pockets. *Id.* ¶ 47. Indeed, the sheer breadth of Defendants' reseller program is astounding—Defendants themselves claim to have over 600+ "[s]ales agents," over 37,000 customers and to have generated over $3,000,000 in revenue from their illicit enterprises. *Id.* ¶ 47, Ex. 24. Defendants have even expanded their reseller program overseas (*e.g.*, in the Philippines). *Id.*

### D. Defendants Know Their Illegitimate Services Are Unlawful

Defendants' modus operandi shows they know they are breaking the law. They have gone to great lengths to hide the fact they are offering an unauthorized IPTV and VOD services. Among other things, Defendants use resellers to hide their illegal role as the orchestrators of these enterprises. Voorn Decl. ¶ 52. As explained above, Defendants have structured the AATV service so that a customer may only purchase an AATV subscription from a reseller. *Id.* Defendants set up the reseller program in this way to try to insulate themselves from responsibility for these infringing services and as an attempt to (unsuccessfully) remain incognito. *Id.* ¶ 49. As further detailed above, Defendants have also created private messaging groups for resellers, all in an effort to hide the illegality of their conduct.

In further efforts to cover their tracks, Defendants use a complex and seemingly endless web of various websites, domain names, and applications to operate their infringing AATV and Quality Restreams services. *Id.* ¶ 51. For instance, in June 2021, Defendants sold AATV subscriptions via aatvpanel.com, but now sell subscriptions through www.backoffice.vpnsafevault.com, a website that has been stripped of all AATV branding and designed to appear that it sells VPN software instead of subscriptions to their illicit services. *Id.* ¶ 26, Ex. 15. Defendants have also stopped linking aatvdigitalmedia.com to the site where subscribers can purchase subscriptions and receive user credentials. Subscribers now receive instructions on how to access this site via word of mouth.

10

Moreover, many of the domains underlying both the Quality Restreams and AATV services are shielded by privacy proxies, further evidencing Defendants' intent to operate in secret. *Id*. ¶ 51. Indeed, Plaintiffs were only able to discover that Johnson is the registrant for myaatv.com through a Domains By Proxy registrant discovery request. *Id*. Defendants have also failed to register AATV and Quality Restreams as corporate entities in an attempt to anonymize their operations. *Id*. ¶ 50.

Defendants' efforts to hide their infringing activity do not change the fact they are engaged in a mass infringing scheme, but Defendants' evasive conduct shows they are well aware they are running an illegal business.

## III.   ARGUMENT

The Copyright Act authorizes courts to grant injunctive relief "to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). A preliminary injunction is warranted here given Plaintiffs have established: "(1) [they are] likely to succeed on the merits, (2) [they are] likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in [their] favor, and (4) an injunction is in the public interest." *Disney Enters., Inc. v. VidAngel, Inc*., 869 F.3d 848, 856 (9th Cir. 2017) (internal quotation marks omitted) (quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008)); *see also A&M Recs., Inc. v. Napster, Inc*., 239 F.3d 1004, 1013 (9th Cir. 2001), *as amended* (Apr. 3, 2001).

### A.   Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs will succeed on the merits of their infringement claim because they easily: (1) "show ownership of the allegedly infringed material;" and (2) "demonstrate that the [Defendants] violate at least one exclusive right granted . . . under 17 U.S.C. § 106." *VidAngel*, 869 F.3d at 856 (internal quotation marks omitted) (quoting *Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146, 1159 (9th Cir. 2007)). In particular, Defendants, through their infringing services, violate two of Plaintiffs' exclusive rights: (1) the right to publicly perform, and (2) the right to reproduce Plaintiffs' Copyrighted Works. Each violation independently is

11

sufficient to support the requested preliminary injunction.  *See, e.g.*, *Napster*, 239 F.3d at 1013.

### 1. Plaintiffs Own or Control Valid Copyrights in The Works Defendants Exploit

Plaintiffs have included certificates of registration issued by the Copyright Office for the Copyrighted Works identified in the Complaint with this filing. Declaration of Sean M. Sullivan ("Sullivan Decl.") ¶¶ 2-69, Exs. 1-68.  The certificates create a presumption of copyright validity and ownership.  17 U.S.C. § 410(c); *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011) ("A copyright registration is 'prima facie evidence of the validity of the copyright and the facts stated in the certificate.'"); *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 969 (C.D. Cal. 2016) (*VidAngel I*) ("Plaintiffs have sufficiently demonstrated ownership of the copyrighted works identified in the complaint by providing certificates of registration issued by the Copyright Office."), *aff'd*, 869 F.3d 848 (9th Cir. 2017).  Moreover, through their pleadings and declarations, Plaintiffs have also shown that they own the copyrights and/or the relevant exclusive rights in the Copyrighted Works.  Sullivan Decl. ¶¶ 2-69, Exs. 1-68.  Ownership of the Copyrighted Works has therefore been established.

### 2. Defendants Directly Infringe Plaintiffs' Exclusive Rights

#### (a) Defendants Publicly Perform Plaintiffs' Copyrighted Works

Plaintiffs have the exclusive right, among others, "to perform" the Copyrighted Works "publicly."  17 U.S.C. § 106(4).  A party performs a work publicly when it "transmit[s] or otherwise communicate[s] a performance . . . of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times."  *Id*. § 101(2) (definition of "[t]o perform . . . a work 'publicly'").

Case law is legion that the streaming of copyrighted movies and television programs over the Internet to customers without authorization violates the exclusive public performance right of the entity that owns or controls this exclusive right.  *See*, *e.g.*, *Am. Broad. Cos., Inc. v. Aereo, Inc*., 573 U.S. 431, 431 (2014) (finding Internet streaming constitutes public performance); *VidAngel I*, 224 F. Supp. 3d at 970-71 (streaming motion pictures from master copies constituted "publicly performing"); *Galindo*, 2020 WL 3124347, at *2 ("The internet streaming of full copyrighted works without authorization constitutes a violation of this exclusive right."); *Universal City Studios Prods. LLLP v. TickBox TV LLC*, No. CV 17-7496-MWF (ASx), 2018 WL 1568698, at *9 (C.D. Cal. Jan. 30, 2018) ("Broadcasting copyrighted video content to the public over the internet without authorization infringes upon the copyright owner's public performance right."); *Warner Bros. Ent. Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1006-07, 1010-11 (C.D. Cal. 2011) (holding service violated public performance right by streaming contents of DVDs from DVD players purportedly assigned to individual users).

Here, the evidence is clear that Plaintiffs' Copyrighted Works are being transmitted via the Internet on the AATV Platforms and Websites to a public audience without Plaintiffs' authorization.  Voorn Decl. ¶¶ 7-10, 21-43.[9]  Defendants therefore directly violate the public performance right.  *See Nat'l Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 13 (2d Cir. 2000) ("a public performance . . . includes 'each step in the process by which a protected work wends its way to its audience'"); *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F.

---

[9] The declaration from Plaintiffs' investigator provides proof of Defendants' infringing conduct.  *See Arista Recs. LLC v. Lime Grp. LLC*, No. 06 CV 5936 (KMW), 2011 WL 1641978, at *8 (S.D.N.Y. Apr. 29, 2011) ("Courts have consistently relied upon evidence of downloads by a plaintiff's investigator to establish both unauthorized copying and distribution of a plaintiff's work.") (collecting cases); *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 150 n.16 (S.D.N.Y. 2009) ("Courts routinely base findings of infringement on the actions of plaintiffs' investigators.").

Supp. 2d 1138, 1151 (C.D. Cal. 2012) (granting preliminary injunction to enjoin streaming service from "retransmitting, streaming, or otherwise publicly performing" plaintiffs' copyrighted works).

### (b)   Defendants Reproduce Plaintiffs' Copyrighted Works

Plaintiffs hold the exclusive right "to reproduce" their works, 17 U.S.C. § 106(1), which includes the right to create digital copies. *See*, *e.g.*, *Napster*, 239 F.3d at 1014 ("download[ing] files containing copyrighted music violate[s] plaintiffs' reproduction rights"); *MAI Sys. Corp. v. Peak Computer, Inc*., 991 F.2d 511, 518 (9th Cir. 1993) (explaining that the transferring digital work "from a permanent storage device to a computer's RAM [or storage]" infringes the reproduction right); *Disney Enters., Inc. v. VidAngel, Inc*., 371 F. Supp. 3d 708, 717 (C.D. Cal. 2019) ("extract[ing] data files" and "creat[ing] 'locally cached' file[]" is copying); *Galindo*, 2020 WL 3124347, at *2 (preliminarily enjoining similar service offering 24/7 channels and VOD because "digitally reproducing the Copyrighted Works on Nitro TV violates Plaintiffs' reproduction right.").

Here, Defendants, and/or third parties acting in concert with Defendants, must create unauthorized copies of Plaintiffs' Copyrighted Works to offer their so-called "24/7" channels. As explained above, these 24/7 channels continuously stream a single show or movie, or all of the movies in a franchise or collection (*e.g.*, all of the *Harry Potter* movies), or all of the episodes in a television series (*e.g.*, *The Office*), at all times of the day and night, seven days a week. Voorn Decl. ¶ 34, Ex. 20. Unlike the unauthorized streaming of hijacked live channels (*e.g.*, Paramount Network, FX, and A&E), Defendants' 24/7 channels are individually compiled. *Id*. ¶ 35. Such compilation necessarily entails reproducing copies of the relevant movie(s) or television program(s) in order to assemble them into a continuous loop for the purpose of transmitting them nonstop via the AATV Platforms. *Id*.

Similarly, Defendants' VOD service requires the making of digital copies of Plaintiffs' Copyrighted Works. *Id*. ¶ 39. In particular, the VOD library necessarily

14

was copied and is stored on Defendants' servers (or on the servers of third parties acting in concert with Defendants), which must be accessed for Defendants to provide "on demand" streams at the moment their subscribers request those streams. *Id.*; *see*, *e.g.*, *VidAngel I*, 224 F. Supp. 3d at 969-70 (enjoining infringing service based on reproduction right violation); *Tiffany Design, Inc. v. Reno-Tahoe Specialty, Inc.*, 55 F. Supp. 2d 1113, 1121 (D. Nev. 1999) ("[T]he digitization or input of any copyrighted material, whether it be computer code or visual imagery, may support a finding of infringement notwithstanding only the briefest of existence in a computer's RAM.")

### 3. Defendants Are Liable for Secondary Infringement

Defendants are also liable for copyright infringement under two well-established theories of secondary liability: (1) contributory infringement, and (2) inducement.  As explained below, each of these theories provides an independent basis for the issuance of an immediate injunction.  *See*, *e.g.*, *TickBox*, 2018 WL 1568698, at *8 (granting preliminary injunction on basis of likelihood to succeed on inducement to infringe claim); *see also Napster*, 239 F.3d at 1019-22 (affirming grant of preliminary injunction because plaintiffs "demonstrated a likelihood of success on the merits of the contributory copyright infringement claim").

### (a) Defendants Are Liable for Contributory Infringement

A defendant is liable for contributory infringement where the defendant "has knowledge of another's infringement" and "materially contributes" to that infringement.  *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 745 (9th Cir. 2019) (internal quotation marks omitted).  Both elements are plainly satisfied here.

### (1) Defendants Possesses Knowledge of Infringement

As the Ninth Circuit has explained, the knowledge element is satisfied if a defendant has "actual knowledge of specific acts of infringement" or is "[willfully] blind[] of specific facts" from which infringement can be inferred.  *Erickson Prods.,*

15

*Inc. v. Kast*, 921 F.3d 822, 832 (9th Cir. 2019); *see also Napster*, 239 F.3d at 1020 (finding knowledge element satisfied). "[C]onstructive knowledge" of infringement, *i.e.*, those who "know or have reason to know" infringement is taking place, is also sufficient to satisfy this element. *See Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.,* 658 F.3d 936, 943 (9th Cir. 2011).

Here, Defendants clearly know their services are being used to stream and copy Plaintiffs' Copyrighted Works without authorization given the manner in which they operate their infringing services. For instance, Defendants have taken steps to hide their tracks and anonymize their operations—including by taking certain Websites offline, registering domain names associated with their services via proxies that allow registrants to remain anonymous, and by creating and administering private reseller Facebook groups. Voorn Decl. ¶¶ 17, 27, 49, 51. Defendants have also set up their reseller program so that customers wishing to purchase AATV subscriptions can only do so by connecting with a reseller. *Id.* ¶ 52. Because of this setup, Defendants try to hide their illegal role as the orchestrators of these enterprises, further evidencing that they know their services are illegal. *See Elsevier Inc. v. Siew Yee Chew*, No. 17 Civ. 6225 (JGK) (GWG), 2019 WL 74606, at *9 (S.D.N.Y. Jan. 2, 2019) (finding infringement willful where defendant "attempted to change or conceal their identities to avoid detection"); *Solid Host, NL v. Namecheap, Inc*., 652 F. Supp. 2d 1092, 1096 (C.D. Cal. 2009) (noting services that register domain names through a proxy to allow registrants to remain anonymous "[n]aturally . . . appeal to registrants who wish to conceal their identities for illegitimate purposes").

Alternatively, at a minimum, Defendants have exhibited a "willful blindness" to the infringement taking place via their services. Defendants have not only assembled thousands of channels and VOD offerings, but they also sell access to this vast collection for as little as $10.00 a month. Voorn Decl. ¶¶ 22-23. This figure is so incongruous with rates charged by legitimate services (Kang Decl. ¶ 31) that it

evidences that Defendants know, or are deliberately and willfully blind to the fact, that third parties are infringing Plaintiffs' copyrights by transmitting them without authorization. *See*, *e.g*., *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 991 (9th Cir. 2017) (failure to "attempt to check or inquire into" whether plaintiffs had authorized use of copyrighted works was more than "sufficient evidence of willful infringement").

### (2)   Defendants Materially Contribute to Infringement

Material contribution is established where a defendant "substantially assists websites to distribute their infringing copies to a worldwide market and assists a worldwide audience of users to access infringing materials." *Perfect 10, Inc.*, 508 F.3d at 1172.  This is exactly what Defendants are doing with their infringing enterprises: Defendants' customers (both AATV subscribers and IPTV operators who use Quality Restreams to provide their subscribers with unauthorized content) demand access to infringing streams that originate from infringing copies of Plaintiffs' Copyrighted Works. *See*, *e.g.*, *Napster*, 239 F.3d at 1022-23; *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) ("[P]roviding the site and facilities for known infringing activity is sufficient to establish contributory liability.").  By delivering customers demanding access, Defendants materially contribute to third parties' making those copies.  This conduct is more than enough to establish material contribution. *Perfect 10*, 508 F.3d at 1172.

### (b)   Defendants Are Liable for Inducing Infringement

Defendants' illicit conduct also gives rise to secondary liability under an inducement theory.  Inducing copyright infringement is established where: (1) the defendant distributes "a device or product," including "providing some service used in accomplishing the infringement"; (2) a third party engages in "acts of infringement"; (3) the defendant has "an object" of "promoting [the device's or product's] use to infringe copyright"; and (4) the defendant "causes" the

17

infringement.  *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1032-33

(9th Cir. 2013) (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd*.,

545 U.S. 913, 936-37 (2005)).  All four elements are satisfied here.

### (1)   Defendants Distribute Infringing Services

The first two elements are easily met here given that Defendants distribute—

either directly or through a growing network of resellers—the AATV Platforms and

Websites that provide users with unauthorized access to Plaintiffs' Copyrighted

Works.  Voorn Decl. ¶¶ 7-10, 21-48.  *See TickBox*, 2018 WL 1568698, at *8, *10

("one may be liable for copyright infringement under the *Grokster* inducement theory

if . . . he provides a service that facilitates copyright infringement . . .  [and]

defendant's device or service is funneling users to third parties that are directly

infringing upon the plaintiffs' exclusive rights under the Copyright Act (*i.e.*,

displaying copyrighted images or broadcasting copyrighted video content")) (citing

*Fung*, 710 F.3d at 1033).

### (2)   Defendants' Object of Promotion Is Infringement

The evidence also shows that Defendants are clearly acting "with the object of

promoting [their services] to infringe copyright," as evidenced by the "affirmative

steps taken to foster infringement."  *Grokster*, 545 U.S. at 936-37.  For instance,

Defendants have promoted their services as a "100% [a]lternative to [c]able &

[s]atellite TV" and as a streaming "franchise opportunity."  Voorn Decl. ¶¶ 16, 46,

Exs. 6, 23.  Such advertising is "[t]he classic instance of inducement."  *Grokster*, 545

U.S. at 937.  And while Defendants primarily rely on their resellers to do Defendants'

"dirty work" of marketing and obtaining subscribers for their illegal services, their

object is still to promote the use of their services to infringe.  Indeed, Defendants'

resellers aggressively market the infringing services for their own and Defendants'

benefit given that profits are driven by the number of subscribers—which is exactly

how Defendants intend for the system to work.  Voorn Decl. ¶ 45.  What is more,

18

Defendants themselves claim to have generated over $3,000,000 in profits and to have over 37,000 customers.  *Id.* ¶ 46, Exs. 23-24; *see Fung*, 710 F.3d at 1036-37 ("The more users who visit [Defendant] Fung's websites and view the advertisements supplied by Fung's business partners, the greater the revenues to Fung."); *see also TickBox*, 2018 WL 1568698, at *11 (profits derived from infringement relevant to this factor).[10]

### (3)     Defendants' Actions Cause Infringement

The causation element is plainly satisfied based on the evidence of Defendants' role in the infringing enterprises.  *See* Section II.A-D, *supra*; *see also Fung*, 710 F.3d at 1037 ("[I]f one provides a service that could be used to infringe copyrights, with the manifested intent that the service actually be used in that manner, that person is liable for the infringement that occurs through the use of the service."); *see also China Cent. Television v. Create New Tech. (HK) Ltd.*, No. CV 15-01869 MMM (MRWx), 2015 WL 3649187, at *10 (C.D. Cal. June 11, 2015) ("defendants are the but-for cause of [the] infringement, i.e., their distribution and promotion of the Infringing TVpad Apps is the mechanism that makes that infringement by a large number of users possible.").

In sum, Defendants are, at a minimum, secondarily liable for their conduct.

### B.     Plaintiffs Will Suffer Irreparable Harm if an Injunction Does Not Issue

Plaintiffs have already suffered irreparable harm as a result of Defendants' unlawful conduct.  "[I]rreparable harm[s]" include those that are "'neither easily calculable, nor easily compensable.'"  *WTV Sys., Inc.*, 824 F. Supp 2d at 1013. Courts have found irreparable harm threatened by similar infringing online streaming services.  *See, e.g., WPIX, Inc. v. ivi, Inc.*, 691 F. 3d 275, 285-87 (2d Cir.

---

[10] Moreover, Defendants provide customer support and detailed "instructions to [a subscriber] concerning how to effectively access copyrighted material," which also shows Defendants' object to promote infringement.  Voorn Decl. ¶¶ 26, 28; *see also TickBox*, 2018 WL 1568698, at *11.

2012) (finding extensive irreparable harms caused by unlicensed Internet retransmissions of live television channels); *BarryDriller*, 915 F. Supp. 2d at 1147 (same); *Galindo*, 2020 WL 3124347, at *2 (finding Plaintiffs demonstrated irreparable harm for similar IPTV and VOD service). The same result should follow here for the following reasons.

First, Defendants' infringing services interfere with Plaintiffs' basic right to control "when, where, to whom, and for how much they will authorize transmission of their Copyrighted Works to the public." *WTV Sys., Inc.*, 824 F. Supp. 2d at 1012-13. By engaging in the conduct described above, Defendants usurp Plaintiffs' control over the exercise of their exclusive rights by interfering with Plaintiffs' distribution strategies, including Plaintiffs' right to structure the offering of their Copyrighted Works to the public through downstream services, often by exclusive licenses and/or varying the time and medium by which a particular Copyrighted Work is available (referred to as "windowing"). Kang Decl. ¶¶ 10-11, 21. Defendants directly interfere with Plaintiffs' distribution strategies in at least three ways: (1) Defendants offer more channels and content than are available on any legitimate service—over 2,500 live and title-curated channels and over 1,200 VOD content (approximately 600 movies and 600 TV series, which often include multiple seasons and episodes per series), Voorn Decl. ¶¶ 31, 37; (2) Defendants do not honor geographic restrictions and thus stream numerous versions of the live channels from multiple cities across the U.S. to all subscribers wherever they are located, exceeding the licensed offerings on legitimate cable or satellite providers, *id*. ¶ 32; and (3) Defendants' 24/7 channels offer a format that Plaintiffs do not license to any legitimate service, *id*. ¶¶ 31, 35. Defendants' operation of these "infringing service[s] without the normal licensing restrictions imposed by Plaintiffs . . . interfere[s] with Plaintiffs' ability to control the use and transmission of their Copyrighted works, thereby, causing irreparable injury." *VidAngel I*, 224 F. Supp. 3d at 975 (quoting *WTV Sys., Inc.*, 824 F. Supp. 2d at 1012-13); *Galindo*, 2020 WL 3124347, at *2 ("Not only is Defendant directly infringing

1  Plaintiffs' copyrights, creating a financial loss to Plaintiffs, but Plaintiffs have
2  provided evidence that the unlawfully distributed Copyrighted Works may undermine
3  the value of Plaintiffs' legitimate licenses.").

4  Second, Defendants' illegal conduct harms Plaintiffs' existing relationships
5  and goodwill with legitimate services.  These legitimate services negotiate their
6  licenses and abide by contractual restrictions.  Kang Decl. ¶ 25.  Defendants
7  interfere with these restrictions by circumventing them altogether.  *Id*.  This unfair
8  competition undermines Plaintiffs' goodwill with their licensees and the legitimate
9  distribution system for creative content.  *Id*.  *See*, *e.g.*, *BarryDriller*, 915 F. Supp. 2d
10  at 1147 ("If Defendants can transmit Plaintiffs' content without paying a fee,
11  Plaintiffs' existing and prospective licensees will demand concessions to make up
12  the loss of viewership to non-paying alternatives."); *VidAngel I*, 224 F. Supp. 3d at
13  975 ("Because VidAngel operates without any license and performs Plaintiffs'
14  works during negotiated exclusivity periods it interferes with Plaintiffs' exercise of
15  their exclusive rights and frustrates Plaintiffs' ability to negotiate for similar rights
16  in the future."); *WTV Sys., Inc.*, 824 F. Supp. 2d at 1012-13 (finding unlicensed
17  streaming "jeopardize[d] the continued existence of Plaintiffs' licensees' businesses"
18  and harmed plaintiffs' goodwill with its licensees).

19  Third, the operation and existence of the Defendants' infringing services
20  contributes to consumer confusion regarding the lawfulness of certain services by
21  misleading customers into believing that their services are also legitimate and
22  drawing users away from Plaintiffs' licensees.  *See WTV Sys., Inc.*, 824 F. Supp. 2d
23  at 1013 (finding that defendants' service threatened "to create incorrect but lasting
24  impressions with consumers about what constitute[d] lawful video on demand
25  exploitation" of copyrighted works); *Galindo*, 2020 WL 3124347, at *2
26  (unauthorized IPTV and VOD service could "also lead to unquantifiable customer
27  confusion and an overall diminution of value of the Copyrighted Works").

28  Finally, monetary damages will not adequately compensate Plaintiffs for the

21

loss of control over the Copyrighted Works, the damage to their business goodwill, and harm to the continued advancement of legitimate distribution channels for creative works.  Kang Decl. ¶¶ 32, 37-38; *see TickBox*, 2018 WL 1568698, at *13 ("[I]t is unlikely that money damages could adequately compensate for difficult-to-quantify harms to Plaintiffs' business models and relationships" from unauthorized streaming.).  Money damages also are inadequate because there is no reasonable prospect that Defendants will be able to satisfy an award in this case.  The statutory damages for each work infringed through Defendants' willful inducement may be as much as $150,000.  17 U.S.C. § 504(c).  Defendants have infringed all seventy-one of Plaintiffs' Copyrighted Works and have illegally exploited the rights in many more of Plaintiffs' works.  Defendants, therefore, will likely be responsible for a damages award far in excess of their ability to pay.  *See*, *e.g.*, *BarryDriller*, 915 F. Supp. 2d at 1147; *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007) ("[A]n award of monetary damages will be meaningless, and the plaintiff will have no substantive relief, where it will be impossible to collect an award for past and/or future infringements perpetrated by a defendant.").

The scope of the foregoing harms caused by Defendants and those acting in concert with them continues to expand, and Defendants themselves have identified over 600 "[s]ales agents" that belong to Defendants' reseller network.  Voorn Decl. ¶ 47, Ex. 24.  Unless the requested preliminary injunction is issued, this network— and the irreparable harm Defendants' infringement inflicts upon Plaintiffs—will likely only continue to grow.  *Id*. ¶¶ 44, 47; Kang Decl. ¶ 19.

### C.    The Balance of Hardships Tips Sharply in Plaintiffs' Favor

Before issuing a preliminary injunction, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24.

As explained above, the threat of harm to Plaintiffs is substantial.  *See* Section III.B, *supra*.  Defendants, on the other hand, "cannot complain of the harm that will

befall it when properly forced to desist from its infringing activities." *Triad Sys. Corp. v. Se. Express Co*., 64 F.3d 1330, 1338 (9th Cir. 1995), *superseded by statute on other grounds*, 17 U.S.C. § 117(c); *see Cadence Design Sys., Inc. v. Avant! Corp*., 125 F.3d 824, 830 (9th Cir. 1997) ("[W]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration . . . .")(internal quotation marks omitted); *Apple Inc. v. Psystar Corp*., 673 F. Supp. 2d 943, 950 (N.D. Cal. 2009) ("Since [small start-up defendant] does not (and cannot) claim any *legitimate* hardships as a result of being enjoined from committing unlawful activities, and Apple would suffer irreparable and immeasurable harms if an injunction were not issued, this factor weighs strongly in favor of Apple's motion."), *aff'd*, 658 F.3d 1150 (9th Cir. 2011).

The balance of hardship factor is therefore decidedly in Plaintiffs' favor.

### D.     An Injunction Serves the Public Interest

Finally, the issuance of a preliminary injunction is in the public interest given that a compelling interest is involved here—the upholding of copyright protections. *See Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003) ("[t]he economic philosophy behind the [Copyright] [C]lause . . . is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors"); *VidAngel*, 869 F.3d at 867 ("[T]he public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating television programming and motion pictures.") (internal quotation marks omitted); *Kelly v. Primco Mgmt., Inc*., No. CV 14-07263 BRO (SHx), 2015 WL 10990368, at *16 (C.D. Cal. Jan. 12, 2015) ("[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections . . . .") (internal quotation marks omitted).  By contrast, "Defendant[s'] alleged copyright infringement does not offer any lawful benefit to the public." *Galindo*, 2020 WL 3124347, at *3.

In sum, a preliminary injunction should issue because Plaintiffs are likely to succeed on the merits, they stand to suffer irreparable harm, the balance of hardships tips in Plaintiffs' favor, and such an injunction would be in the public interest.

## IV.   RELIEF REQUESTED

### A.   Plaintiffs Request an Injunction That Protects Their Copyrights

Plaintiffs request an injunction: (1) prohibiting further infringement, including copying, streaming, or otherwise exercising any of Plaintiffs' exclusive rights without authorization; and (2) temporarily freezing Defendants' Websites, and any other Websites Defendants use to provide their infringing services, so those Websites cannot be accessed or transferred during the pendency of this action.[11]

Defendants have anonymized the registrations of many of the domain names they use to operate their illicit enterprises.  Voorn Decl. ¶ 51.  Where, as here, infringing websites are operated by Defendants who attempt to elude identification, Plaintiffs have learned, through unfortunate experience, that infringers—confronted with a lawsuit seeking to stop their ongoing infringement—are likely to transfer their operations to a close associate, such as a reseller, or instruct their registrar to transfer their domain name to another entity not subject to the jurisdiction of this Court and revive their infringing activities using new servers and infrastructure. To avoid this, courts commonly issue broad injunctions.  *See Galindo*, 2020 WL 3124347, at *3 (enjoining Namecheap, Inc. and Domain.com LLC from "allowing the Infringing Domain Names to be modified, sold, transferred to another owner, or deleted"); *Showtime Networks Inc. v. Doe*, No. 2:15-CV-03147-GW-MRW, 2015 WL 12646501, at *2 (C.D. Cal. Apr. 30, 2015) (temporary restraining order requiring all "hosts, registrars and name servers" to "suspend all services with

---

[11] This injunction should also apply to all those acting in concert with Defendants.

24

1   respect to Defendants' Infringing Websites" to prevent specific illegal streaming).[12]

2       As a result, Defendants request that the Court issue an order enjoining the

3   respective domain name registrars for the Websites.

4       **B.     No Bond Should Be Required**

5       Plaintiffs also respectfully request that the Court order no bond is required

6   here.  To start, a security bond is not required when entering a preliminary

7   injunction.  *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) ("The district court

8   retains discretion 'as to the amount of security required, *if any*.'") (quoting *Johnson*

9   *v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)).  Any hardship Defendants face,

10  moreover, results from their voluntary decision to build a business around violating

11  Plaintiffs' rights.  Plaintiffs respectfully submit that no security should be required.

12  **V.    <u>CONCLUSION</u>**

13      For the foregoing reasons, Plaintiffs respectfully request that the Court grant

14  the requested preliminary injunction.

15

16   DATED: December 8, 2021                     _____/s/ Sean M. Sullivan_____
                                                          Sean M. Sullivan
17                                                        Arleen Fernandez
                                                 DAVIS WRIGHT TREMAINE LLP
18                                               865 South Figueroa Street, 24th Floor
                                                 Los Angeles, California 90017-2566
19
                                                    Elizabeth A. McNamara
20                                               DAVIS WRIGHT TREMAINE LLP
                                                 1251 Avenue of the Americas, 21st Floor
21                                                     New York, NY 10020

22                                                  Attorneys for Plaintiffs

23

24

25

26

27  ───────────────────
    [12] Indeed, Defendants already attempted to distance themselves from these
28  infringing operations by requiring that customers purchase from and only interact
    with resellers.  Voorn Decl. ¶¶ 22, 52.

                                        25